**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

ENERGY RESOURCES OF AUSTRALIA,
LIMITED,
Plaintiff-Appellant,

v.                                                                          No. 96-1496

SOUTH CAROLINA ELECTRIC & GAS
COMPANY,
Defendant-Appellee.

Appeal from the United States District Court
for the District of South Carolina at Columbia.
Patrick Michael Duffy, District Judge.
(CA-94-1015-3-23)

Argued: June 3, 1997

Decided: August 19, 1997

Before WILKINS, NIEMEYER, and HAMILTON, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Herbert Dale Shellhouse, TROUTMAN SANDERS,
Atlanta, Georgia, for Appellant. Manton McCutchen Grier, SINKLER
& BOYD, P.A., Columbia, South Carolina, for Appellee. **ON
BRIEF:** John J. Dalton, TROUTMAN SANDERS, Atlanta, Georgia;
Robert E. Stepp, Elizabeth G. Howard, GLENN, MURPHY, GRAY
& STEPP, Columbia, South Carolina, for Appellant. Sue C. Erwin,

SINKLER & BOYD, P.A., Columbia, South Carolina; Randolph Reed Mahan, SOUTH CAROLINA ELECTRIC & GAS COMPANY, Columbia, South Carolina, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

This appeal presents the question of what price applies under a uranium supply contract. In particular, the question presented is whether a two-tiered price structure, as described in the contract, came into existence so as to trigger a special price for uranium.

On April 2, 1986, Energy Resources of Australia, Ltd. ("Energy Resources") and South Carolina Electric & Gas Company ("SCE&G") entered into a contract under which Energy Resources agreed to supply uranium to SCE&G in each of five "Delivery Years" at a price defined according to a formula established by the contract. The price for each delivery was generally determined to be the lesser of the "Contract Price" and the "Ceiling Price." And the contract defines both the "Contract Price" and the "Ceiling Price" as a function of the "Reference Value," which is defined in Section 3.4 of the contract:

> 3.4 The "Reference Value" shall mean the Nuclear Exchange Corporation ("Nuexco") Transaction Value or, should Nuexco cease to publish the Transaction Value, the midpoint of the Nukem BMGH ("Nukem") price range, or should Nukem cease to publish price ranges, then such other method as may be mutually agreed upon.

Those general price terms of Section 3.4, however, are subject to the special terms of Section 4.5, which redefine the "Reference Value"

2

when a two-tiered price structure "comes into existence" in the market. It provides:

> If any authority of the United States of America having jurisdiction imposes restrictions on the use of foreign uranium, <u>and, as a consequence, a two-tiered price comes into existence</u> which is quoted by either or both of Nuclear Exchange Corporation and Nukem GMBH, one such price being for United States-origin and the other for uranium of foreign origin, <u>then the Reference Value shall be ascertained by reference only to the lower of the two prices so quoted.</u>

(Emphasis added). Thus, if the conditions described in Section 4.5 occur, the special definition of "Reference Value" established by that section determines the price for uranium under the supply contract.

In November 1991, U.S. uranium producers petitioned the United States Department of Commerce to investigate uranium sales from the Soviet Union at less than market prices. Although the investigation was begun, it was never completed because on October 19, 1992, the Department of Commerce announced agreements with six former-soviet republics that had remained subjects of the investigation. Those agreements limited the importation of uranium into the United States from the six republics under price-tied quotas. As long as the market price, as determined by Department of Commerce every six months, remained below $13 per pound, uranium from those republics would be barred from the U.S. market, except as exempted under certain pre-existing, long-term contracts. If prices rose above $13 per pound, the republics could export increasing quantities to the United States, depending upon the market price level. If the price exceeded $21 per pound, there would be no limit as to the volume of uranium imports permitted to the United States from the six republics. Since the inception of the agreements, the market price has not risen above $13 per pound.

As a result of the quota agreements with the six republics, a two-tiered price structure developed in the uranium market. "Restricted" uranium -- that subject to the agreements -- sold at a lower price because the legal restrictions on its importation into the United States

3

weakened demand for it. Both Nuexco and Nukem began quoting two prices, a lower price for uranium subject to the quota agreements and a higher price for all other uranium.

In January and December of 1994, Energy Resources made deliveries to SCE&G under the supply contract, and SCE&G paid for the deliveries by calculating the purchase price under Section 4.5 of the contract, claiming that the two-tiered price structure contemplated by that section had come into existence. Energy Resources, however, contended that the general price terms of Section 3.4 governed. When SCE&G refused to accede to Energy Resources interpretation of the contract, Energy Resources filed this action. Both parties moved for summary judgment, relying principally on their interpretation of the deposition testimony of Paul Davis who had been SCE&G's lead negotiator of the supply contract.

SCE&G argued that Section 4.5 unambiguously applied because (1) the Department of Commerce is an "authority of the United States of America having jurisdiction," (2) the Department of Commerce "impose[d] restrictions on the use of foreign uranium," and, (3) both of Nuexco and Nukem quoted two prices for uranium, (4) "one such price being for United States-origin and the other for uranium of foreign origin."

Energy Resources contended that Section 4.5 did not apply because (1) the Department of Commerce restrictions were not"imposed," but were the product of agreements with the six republics; (2) the restrictions were not on the "use" of uranium, but on its importation; and (3) the price quoted for foreign uranium did not apply to all foreign uranium, but only to uranium from certain foreign sources.

The district court granted summary judgment in favor of SCE&G, holding that Section 4.5 applied since each of its conditions had been met. In so holding, the court determined that Section 4.5 of the contract was not ambiguous and that even if it were, the undisputed evidence of Paul Davis, on which both parties relied to clarify Section 4.5, indicated that it was intended to be a general provision, applying whenever a two-tiered price structure developed due to government-imposed restrictions on foreign source uranium.

4

On appeal, Energy Resources reiterates the arguments it made below. It also argues that the district court erroneously considered all the extrinsic evidence submitted in the light most favorable to SCE&G. We have carefully considered Energy Resources' additional argument but find it unpersuasive. Taken in its totality, the deposition testimony of Paul Davis -- upon which both parties relied -- can only be understood to support SCE&G's position. See Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 817-18, 821-22 (4th Cir. 1995) (summary judgment issue to be decided based on totality of evidence, considering only reasonable inferences, and based on plain meaning of evidence, not words read out of context). And Energy Resources introduced no other evidence to contradict what Davis said.

On the other issues, we have carefully reviewed the record and considered the parties' arguments, both written and oral, and we find ourselves in agreement with the district court. See Energy Resources of Australia, Ltd. v. South Carolina Elec. & Gas Co. , C.A. No. 3:94-1015-23 (D.S.C. March 29, 1996). Accordingly, we affirm.

AFFIRMED

5